In Re: The Appeal of Edward H. AR-NOLD, V. Rita Goe and Harrall Robinson from the Decision of North Cornwall Township Board of Supervisors.

In Re: The Appeal of Citizens for Responsible Growth, Ellie Salahub and Mary Jane Smith from the Decision of North Cornwall Township Board of Supervisors Regarding the Wal–Mart.

Appeal of: Citizens for Responsible Growth, Ellie Salahub, Mary Jane Smith, Edward H. Arnold and V. Rita Goe.

Commonwealth Court of Pennsylvania.

Argued Sept. 8, 2008.
Decided Aug. 13, 2009.
Ordered Published Nov. 5, 2009.

J. Dwight Yoder, Lancaster, for appellants.

John C. Goodchild, III and Abby J. Kaplan, Philadelphia, for appellee, Wal–Mart Real Estate Business Trust.

BEFORE: LEADBETTER, President Judge, COHN JUBELIRER, J., and McCLOSKEY, Senior Judge.

OPINION BY President Judge LEADBETTER.

Appellants appeal the grant of a conditional use application by the North Corn-

wall Township Board of Supervisors (Board), which permits the construction of a 225,000 square foot Wal–Mart Supercenter and Tire Lube Express store.

The subject of this dispute is 38.5 acres of land (Property) located along Cornwall Road in North Cornwall Township (Township) owned by the Wal–Mart Real Estate Business Trust (Wal–Mart). In August 2003, the Township rezoned the Property from office and institutional (O & I) to general commercial (C–2).[1] On May 6, 2005, Wal–Mart filed a conditional use application with the Board seeking approval to construct a Wal–Mart Supercenter retail store on 29.8 acres. The Board held a series of 16 public hearings on the application starting on July 12, 2005. Numerous objectors including Township residents and non-residents presented evidence and testified at the hearings. The Board concluded receipt of evidence and public comment at the December 12, 2005 hearing and announced that the hearing was continued until December 28, 2005, for deliberation and possible decision. On December 28, 2005, the Board[2] voted 2–1 to approve the application subject to several conditions. The votes were cast in writing and read into the record.

On January 3, 2006, Ralph Heister replaced Charles Brooks as a member of the Board. At the January 19, 2006 meeting, the Board approved the issuance of the written notification of the conditional use decision in accord with the December 28, 2005 decision, along with the required findings and conclusions. The Township's special counsel mailed written notice of the December 28, 2005 decision accompanied by the required findings and conclusions on January 23, 2006.

■ Appellants filed Notices of Appeal with the Court of Common Pleas of Lebanon County (common pleas) on January 27, 2006, challenging the Board's approval of the conditional use application. Wal–Mart timely intervened in the appeals, but did not appeal the imposition of any of the conditions imposed by the Board. Common pleas issued two opinions[3] on April 5, 2007, and December 19, 2007, upholding the Board's decision and denying Appellants' land use appeals. This appeal followed.[4]

1. In separate and still pending litigation before common pleas, Appellants contend that the Township made significant notice, advertising and procedural errors during the enactment process and, thus, the rezoning should be deemed *void ab initio*. Asserting their likelihood of prevailing in the common pleas action, Appellants have asked our court to postpone consideration of the present appeal. We decline to postpone consideration and further, because until common pleas issues a decision, the ordinances are presumptively valid, and thus we will address Appellants' contentions in this posture. In addition, the ordinances were reenacted in October 2007 and common pleas has ruled that the reenactment was proper. The effect of this reenactment on Wal–Mart's conditional use application is unknown at this time.

2. The Board at this meeting consisted of Charles Brooks, Jr., Daryl Loose, and William Gelgot. Brooks and Loose voted in favor of Wal–Mart's application and Gelgot voted to deny the application.

3. The April 5, 2007 decision held that Wal–Mart's conditional use application was approved by a valid 2–1 vote on December 28, 2005, supported by a final written decision with findings and conclusions on January 23, 2006. The December 19, 2007 decision held that the grant of a conditional use was supported by substantial evidence.

4. The scope of review in a zoning case, where common pleas has taken no additional evidence, is limited to determining whether the zoning hearing board committed an error of law, or whether the board's findings are supported by substantial evidence. *Tennyson v. Zoning Hearing Bd. of West Bradford Twp.*, 952 A.2d 739, 743 fn. 4 (Pa.Cmwlth.2008). Substantial evidence is such relevant evidence

## I. DOES A CHANGE IN THE BOARD'S MEMBERSHIP BEFORE ISSUANCE OF A WRITTEN DECISION INVALIDATE A PRIOR VOTE?

### A. What is the final decision of the Board?

■ Appellants assert that the December 28, 2005 vote was not the final decision of the Board, but rather that the January 23, 2006 written decision constituted the Board's final decision because it was in writing. Further, Appellants assert that because the January 23, 2006 written decision was issued when Supervisor Brooks was no longer a member of the Board, that the decision reflected a 1–1 vote instead of a 2–1 vote. Thus, we determine whether the vote conducted at the December 28, 2005 meeting or the written decision issued on January 23, 2006, constituted the final decision of the Board. The Pennsylvania Municipalities Planning Code[5] (MPC) requires that a governing body ruling on a conditional use application must render a written decision within 45 days after the last hearing before the governing body.[6] Section 913.2(b)(1) of the MPC, added by Act December 21, 1988, P.L. 1329, 53 P.S. § 10913.2(b)(1).

In order to determine the outcome of this issue, we consider both Section 913.2(b)(1) of the MPC, 53 P.S. § 10913.2(b)(1), and the Pennsylvania Sunshine Act. Section 705 of the Sunshine Act requires that:

[i]n all meetings of agencies, the vote of each member who actually votes on any resolution, rule, order, regulation, ordinance or the setting of official policy must be publicly cast and, in the case of roll call votes, recorded.

65 Pa.C.S. § 705. Section 703 of the Sunshine Act defines "official action" as:

(1) Recommendations made by an agency pursuant to statute, ordinance or executive order.

(2) The establishment of policy by an agency.

(3) The decisions on agency business made by an agency.

(4) The vote taken by any agency on any motion, proposal, resolution, rule, regulation, ordinance, report or order.

65 Pa.C.S. § 703. In addition, the Sunshine Act requires that official action and deliberations must take place at a meeting open to the public. 65 Pa.C.S. § 704.

■ In *Pae v. Hilltown Township Zoning Hearing Board,* 35 Pa.Cmwlth. 229, 385 A.2d 616 (1978), the landowners asserted that the oral decision made at a zoning hearing board meeting was not the formal action required by the Sunshine Act because Section 908(9) of the MPC requires a written decision. This court rejected landowners' contentions. Further, a decision of the zoning hearing

---

as a reasonable mind might accept as adequate to support a conclusion. *K. Hovnanian Pa. Acquisitions, LLC v. Newtown Twp. Bd. of Supervisors,* 954 A.2d 718, 722 fn. 3 (Pa. Cmwlth.2008).

**5.** Act of July 31, 1968 *as amended,* 53 P.S. §§ 10101–11202.

**6.** 53 P.S. § 10913.2(b)(1) states:

The governing body shall render a written decision or, when no decision is called for, make written findings on the conditional use application within 45 days after the last hearing before the governing body. Where the application is contested or denied, each decision shall be accompanied by findings of fact or conclusions based thereon, together with any reasons therefor. Conclusions based on any provisions of this act or of any ordinance, rule or regulation shall contain a reference to the provision relied on and the reasons why the conclusion is deemed appropriate in the light of the facts found.

board issued in writing but not publicly announced is invalid. *Bruno v. Zoning Bd. of Adjustment,* 664 A.2d 1077, 1079 (Pa.Cmwlth.1995) [citing *Skopic v. Zoning Hearing Bd. of Hemlock Twp.,* 80 Pa. Cmwlth. 60, 471 A.2d 123 (1984)]. In *Bruno,* this court held that where the Philadelphia Zoning Board of Adjustment orally voted to deny a use variance, but the board erroneously issued a notice that the use variance was granted, the oral vote of the board constituted a valid adjudication. *Bruno,* 664 A.2d at 1079.

Further, Zoning Ordinance § 20.7.C.2 provides that the Board must render a *final decision* within 30 days after the adjournment of the public hearing and that the solicitor must correspond with the applicant in writing within 15 days following the *final decision* informing the applicant of the decision. Section 20.7.C.2 also states that the decision of the Board shall be accompanied by findings of fact and the conclusions based thereon. Thus, § 20.7.C.2 contemplates that the *final decision* of the Board is something different than the written decision issued by the Board.

In addition, the MPC requires that a governing body render a written decision within 45 days. The 45 day requirement is meant to ensure that applicants do not suffer undue delay at the hands of a governing body. Section 913.2(b)(2) of the MPC provides a remedy for *applicants* when the governing body fails to issue a written decision within 45 days. Section 913.2(b)(2) of the MPC provides in relevant part:

[w]here the governing body fails to render the decision within the period required by this subsection … the de-

cision shall be deemed to have been rendered in favor of the *applicant* …

53 P.S. § 10913.2(b)(2) (emphasis added). The requirement that the governing body issue a written decision exists for the benefit of an applicant and the appellate courts. *See Bruno,* 664 A.2d at 1079 (the requirement that adjudications be in writing goes to the reviewability of an adjudication, not to its validity). Thus, the written decision provides a basis upon which the applicant and appellate courts can assess the validity of land use claims.

To hold that the January 23, 2006, written decision was the final decision of the Board would vitiate the Sunshine Act's requirement that all official action, such as votes, take place at a public meeting. Finding that the written decision of a governing body is the final decision would open the door to a governing body voting one way at the open meeting and then issuing a written final decision at odds with the vote. *Washington Twp. v. Gillette,* 26 Pa. D. & C.4th 92 (C.P. Erie 1994) (written decision of a township zoning hearing board which differs with public pronouncement of the decision is void under the Sunshine Act). It is inconceivable that the written decision should conflict with the public vote; thus the only purpose of issuing a written decision is to explain the reasoning and basis for the vote.[7]

This court concludes that in accord with the mandates of the Sunshine Act, the final decision of the Board occurred when it voted at the public meeting on December 28, 2005. Thereafter, the Board complied with requirements of the MPC, issuing a timely written explanation of the reasons for the Board's final decision.

7. This conclusion moots appellants' second contention that after January 3, 2006, Supervisor Brooks had no authority to render a decision and accordingly, the written decision reflects a 1–1 vote, which would act as a denial of the application, rather than a 2–1 approval.

## II. WAS SUPERVISOR BROOKS REQUIRED TO RECUSE HIMSELF?

Appellants assert that Supervisor Brooks should have recused himself for the following reasons: (1) he met with representatives of Wal–Mart regarding possible development of the Property prior to submission of Wal–Mart's application for a conditional use; and (2) his alleged statements in local newspapers that he believed that the road improvement the development would bring would improve traffic conditions.

Due process requires a local governing body in the performance of its quasi-judicial functions [8] to avoid even the appearance of bias or impropriety. A showing of actual bias is unnecessary in order to assert a cognizable due process claim; the mere potential for bias or the appearance of non-objectivity may be sufficient to constitute a violation of due process. *Christman v. Zoning Hearing Bd. of Twp. of Windsor*, 854 A.2d 629 (Pa. Cmwlth.2004) [citing *Kuszyk v. Zoning Hearing Bd. of Amity Twp.*, 834 A.2d 661, 665 (Pa.Cmwlth.2003)]. However, "while an appearance of non-objectivity is sufficient to trigger judicial scrutiny, the significant remedy of invalidation often depends on something more tangible." *Caln Nether Co., L.P. v. Bd. of Supervisors of Thornbury Twp.*, 840 A.2d 484, 496 (Pa. Cmwlth.2004). Recusal is required only where the record demonstrates bias, prejudice, capricious disbelief or prejudgment. *In re Appeal of Miller & Son Paving, Inc.*, 161 Pa.Cmwlth. 138, 636 A.2d 274, 278 (1993) [quoting *In re Blystone*, 144 Pa.Cmwlth. 27, 600 A.2d 672, 674 (1991)]. If a supervisor thinks he is capable of hearing a case fairly, his decision not to withdraw will ordinarily be upheld on appeal. *Id.*

"Generally, recusal is warranted where a member of the tribunal participates as an advocate or witness, publicly expresses predisposition," or has a financial interest or fiduciary relationship with a party in interest. *Christman*, 854 A.2d at 633 [citing *Prin v. Council of the Municipality of Monroeville*, 165 Pa.Cmwlth. 519, 645 A.2d 450 (1994) (councilmember who publicly expressed predisposition against a project through letters on council letterhead required to recuse)]; *Thornbury Twp. Bd. of Supervisors v. W.D.D., Inc.*, 119 Pa.Cmwlth. 74, 546 A.2d 744 (1988) (board member disqualified after taking advocacy role before the board as private citizen in opposition to subdivision plan); *McVay v. Zoning Hearing Bd. of New Bethlehem Borough*, 91 Pa.Cmwlth. 287, 496 A.2d 1328 (1985) (recusal required where a majority of board members, before appointment, signed and filed petitions in opposition to the zoning ordinance at issue); *Borough of Youngsville v. Zoning Hearing Bd. of the Borough of Youngsville*, 69 Pa.Cmwlth. 282, 450 A.2d 1086 (1982) (board member disqualified because he had been employed by the applicant and testified on the applicant's behalf).

Supervisor Brooks met with representatives of Wal–Mart on three occasions, July 1, 2004, July 29, 2004, and September 27, 2004. Each of these meetings predates Wal–Mart's first application dated December 14, 2004. Other employees of the Township were present in addition to Supervisor Brooks and Wal–Mart's representatives. Appellants cite Section 908(8) of the MPC, 53 P.S. § 10908(8), for the proposition that Supervisor Brooks' meetings with Wal–Mart's representatives were inappropriate. However, Section 908(8) of the MPC prohibits communications be-

---

8. The standard is different for actions per- formed in a legislative capacity.

tween the board and parties to a hearing only after commencement of the hearing. In addition, Supervisor Brooks' statements to local newspapers can not necessarily be interpreted as support for the development. Supervisor Brooks merely noted his belief that traffic conditions would improve if the property was developed. He did not state that the property should be developed, a statement which would have indicated prejudgment or a degree of actual bias.

In response to Appellants' request that Supervisor Brooks recuse himself, an attorney for Appellants questioned Supervisor Brooks regarding his ability to be impartial, and fairly and objectively review the application. Supervisor Brooks affirmed his impartiality and ability to objectively and fairly consider all of the evidence. These actions comport with the procedures for recusal discussed in *Appeal of Miller & Son Paving, Inc.* The Board found that Supervisor Brooks was not required to recuse himself. Common pleas held that it found no evidence of an abuse of discretion or an error of law. This court agrees.

### III. DID WAL–MART SATISFY THE CONDITIONAL USE CRITERIA?

**A. Did Wal–Mart's voluntary withdrawal of a site plan and submission of a new site plan require new hearings?**

Wal–Mart originally sought two conditional use permits; one permit for the retailing of all consumer goods and a second permit for the operation of a gas station. At the December 8, 2005 meeting, Wal–Mart voluntarily withdrew the application for a permit to operate a gas station. Wal–Mart verbally requested approval of the remaining permit application for retailing of all consumer goods.

Common pleas affirmed the Board's finding that Wal–Mart properly amended its application because the amendment brought the application into compliance with Section 16.8 of the Zoning Ordinance pertaining to the erection of more than one principle structure on the lot. *See* Common pleas opinion at 9–10. Both common pleas and the Board noted that the Traffic Impact Study submitted by Wal–Mart included separate data for development of the property with and without a gas station and, that, without the gas station, the traffic volume would be reduced. Both the Board and common pleas also noted that the absence of issues surrounding underground storage tanks at the gas station brought the site plan into compliance with the Zoning Ordinance. *Id.*

Whether amendments require new hearings should be decided on a case-by-case basis. It has been noted that:

Generally, amendments which do not change the issues should be permitted, but a modification in the applicant's drawings or plans which is significant in terms of the issues involved probably requires a remand to the zoning officer in cases which must arise by "appeal" [*see* § 9.4.6] or a continued hearing in other cases, to afford the opposition time to prepare its defense. The obvious exception is the amendment designed to conform the application to the requirements of the ordinance, as where an applicant who has been seeking three variances amends his plans to eliminate the need for one.

Robert S. Ryan, *Pennsylvania Zoning Law and Practice* § 9.4.11 (1970). Additional hearings to allow opponents to object would be unnecessary since Wal–Mart withdrew its application for a gas station in response to objections from various op-

ponents. Thus, we conclude that common pleas did not err.

**B. Does Wal–Mart's proposed use constituted a "store for retailing of all consumer goods"?**

Appellants assert that the supercenter is a department store, which is not a permitted use in the C–2 district. Whether a proposed use falls within a given category contained within a zoning ordinance is a question of law. *H.E. Rohrer, Inc. v. Zoning Hearing Bd. of Jackson Twp.*, 808 A.2d 1014, 1016 (Pa.Cmwlth. 2002). Any doubt concerning the meaning of an undefined term should be resolved in favor of the landowner and the least restrictive use. *Id.* The Board of Supervisors is entitled to deference in the interpretation of its zoning ordinance. *Caln Nether Co., L.P.*, 840 A.2d at 491.

Wal–Mart's application stated that it proposed to use the Property as a store for retailing of all consumer goods; a permitted use in the C–2 district. Department stores are a permitted use in a C–1 District. *See* Zoning Ordinance, § 9.2.2.A. Stores for the retailing of all consumer goods are permitted in both districts. *See* Zoning Ordinance, § 9.2.2.C, § 10.2.2.A. Neither a "store for retailing of all consumer goods" nor "department store" is defined in the Zoning Ordinance. Department store is generally defined as "a store selling a wide variety of goods and arranged in several departments." *Webster's Ninth New Collegiate Dictionary* (1984). The term "store for retailing of all consumer goods" is self-defining. While a Wal–Mart supercenter is certainly divided into different departments for the sale of a variety of goods, and thus, encompassed

by the definition of department store, it also fits within the bounds of a store for retailing of all consumer goods. Other permitted uses currently operating in the C–2 district include Kohls, Sears, Lowes, and Kmart, uses that certainly would be encompassed by either "department store" or "a store for the retailing of all consumer goods."

The Zoning Ordinance states that a C–2 district "is designed to accommodate commercial activity . . . uses are . . . customarily associated with a shopping center and other business . . . and commercial uses. . . ." *See* Zoning Ordinance § 10.1. The Board found that the supercenter constituted a store for the retailing of all consumer goods and the proposed use was consistent with the orderly development of the C–2 district and met the requirements of § 20.7(B)(2) of the Zoning Ordinance.[9] Given that the more specific term, "department store," is not defined and, thus should be interpreted in favor of the least restrictive use, and the fact that similar uses such as Kmart, Kohls, Sears and Lowes are operating in this district, this court finds no error in the Board's interpretation of its ordinance.

**C. Is the TLE a permitted accessory use?**

Appellants also contend that the Tire Lube Express (TLE) is a repair garage and thus, not a permitted use in a C–2 District. Although Section 9.2.2.O of the Zoning Ordinance specifically permits a repair garage as a conditional use in a C–1 District, the Zoning Ordinance does not

---

9. Section 20.7(B)(2) of the Zoning Ordinance relating to conditional uses states:

   The proposed use shall be of such location, size and character that, in general, it will be in harmony with the appropriate and orderly development of the District in which it is proposed to be situated, and will not be detrimental to the orderly development of adjacent properties in accordance with the zoning classification of such properties.

allow for a repair garage in a C–2 District. The term "repair garage" is defined as:

> [a] structure, building or area of land or any portion thereof used primarily for the servicing and repair of automotive vehicles. A repair garage may provide one (1) or more of the following services: general mechanical repair of motor vehicles including state inspection, lubrication washing or sale of accessories and motor vehicle fuels. Uses permissible as a repair garage do not include body work, straightening of body parts, painting, welding, and storage of certain vehicles as per Section 16.14 of this Ordinance. A repair garage is not an automobile body shop or retail automotive parts store.

Zoning Ordinance, Article 1. Based on this definition, the Board concluded that the TLE was not a repair garage because it did not repair vehicles, but rather installed items sold within the store. Services include oil changes (only with oil and filters purchased at the store), installation of tires sold within the store, and installation of other automobile accessories sold within the store. Wal–Mart does not intend that the TLE provide state inspection services or any general repair services beyond the installation of products purchased at the supercenter. Having reviewed the record and the Zoning Ordinance definition of "repair garage," and applying the standards noted above, we conclude that the Board did not err in finding that the TLE does not constitute a repair garage.

▇▇▇▇▇ Appellants also challenge the Board's determination that the TLE is a permitted accessory use. Whether a proposed use falls within a given category specified in a zoning ordinance is a question of law and our review is plenary.

*Tennyson v. Zoning Hearing Bd. of West Bradford Twp.*, 952 A.2d 739, 744 (Pa. Cmwlth.2008). An accessory use is defined as "[a] use customarily incidental and subordinate to the principle use or building and located on the same lot with such principle use or building." Zoning Ordinance, Article 1. Black's Law Dictionary (Sixth Edition) defines "incidental" as "[d]epending upon or appertaining to something else as primary; something . . . depending upon another which is termed the principal. . . ." Article 16 of the Zoning Ordinance, relating to the Supplementary District Regulations, governs accessory uses. Section 16.3 deals specifically with Accessory Uses [10] and states, in pertinent part, as follows:

> Nothing in this section shall be construed to limit other uses not mentioned so long as they are clearly accessory to the principle permitted use of the land and do not create a threat to the public health.

Zoning Ordinance, § 16.3.C. As discussed above, the TLE will only provide services related to the installation of items sold at the Supercenter. Wal–Mart's primary purpose in building a supercenter is not to provide motor vehicle related services, but rather the retailing of consumer goods. It is quite likely that even without a TLE the supercenter will still sell motor oil, tires and other automobile accessories. The services provided by the TLE are dependent upon the primary use of the supercenter; that is, there would be no need for motor vehicle installation services, if not for the sale of related motor vehicle consumer goods. Thus, the services provided by the TLE are an incidental result of the primary use of the supercenter, the retailing of all consumer goods. The business

---

**10.** The Zoning Ordinance specifically identifies three permitted accessory uses: private non-commercial swimming pools, private ten-

nis courts and antennas. Zoning Ordinance, Article 16.

of the TLE is clearly subordinate to the primary purpose of the supercenter. Accordingly, the Board did not err in concluding that the TLE is a permitted accessory use.

### D. Did the Traffic Impact Study (TIS) satisfy the requirements of the Zoning Ordinance?

■ Section 20.7.D.12 of the Zoning Ordinance required that Wal–Mart complete a TIS as part of its overall development plan. Appellants assert that Wal–Mart did not submit a TIS that studied the existing roadway network within one mile of the site as required by § 20.7.D.12.a of the Zoning Ordinance.[11] Wal–Mart submitted a TIS, which was supplemented upon request by the Township with a Road Segment Traffic Analysis. The Board heard testimony from Mark Lewis, an expert in traffic engineering, who testified on behalf of Wal–Mart and John A. Nawn, also an expert in traffic engineering, who testified on behalf of Appellants. The Township's experts, Mr. Plank of the ELA Group and Mr. Schick of Rettew Associates, Inc. reviewed the TIS and concluded that it complied with all the requirements of the Zoning Ordinance. The Board made in excess of 20 findings regarding the TIS and specifically determined that

Wal–Mart had met its burden under the Zoning Ordinance.

Appellants assert that the TIS is insufficient to meet the requirements of § 20.7.D.12.a because the TIS does not encompass all intersections within one mile of the site. The TIS studied 7 intersections within the immediate vicinity of the property. There are approximately 30 intersections within one mile of the Wal–Mart site. Ten of the intersections are not located in North Cornwall Township.

The TIS is a required component of the Development Plan that conditional use applicants must submit to the Board as part of the conditional use process. *See* Zoning Ordinance, § 20.7.D.12. The Zoning Ordinance states that in taking action upon a conditional use application the Board may prescribe appropriate conditions and safeguards as may be required so that the location, size and character of the proposed use will be in harmony with the appropriate and orderly development of the District. *See* Zoning Ordinance, § 20.7.B. Thus, the TIS is intended to help the Board determine whether any improvements to the surrounding roadways and intersections are needed as a result of the proposed development.

---

11. The Zoning Ordinance states:
    Traffic Impact Study—A study and report prepared by an independent, qualified engineer which addresses the following:
    a. Existing roadway network within one (1) mile of the site;
    b. Existing traffic volumes and patterns on the roadway network, including ratings of intersections;
    c. An evaluation of cartways in the road network including widths, speed limits, type of construction, load capacity of the cartway and any bridges in the network, site distance problems, intersection geometry problems, and traffic accident history;
    d. The quantity, type and daily distribution of traffic being generated by the proposed land use, for all phases of development, including but not limited to maximum future expansion;
    e. The effect on the existing traffic network by the proposed use, including but not limited to intersection ratings, congestion, delays, increase in potential for traffic accidents, etc.;
    f. An evaluation of the necessary improvements to the local road network to effect no negative impact by the proposed use. This includes the need for road widening, traffic signals, speed limit adjustments, intersection re-alignments, and cartway or bridge improvements to alleviate the deficient structural conditions;
    Zoning Ordinance, § 20.7.D.12.

As interpreted by the Township's expert, Mr. Plank, § 20.7.D.12 requires that applicants study the *major roadways and intersections,* rather than every road and intersection within one mile of the site. The Board explicitly concluded that the TIS included all of the information required to be presented by the Zoning Ordinance. *See* Board Opinion at ¶ 157. The Board is entitled to deference in the interpretation of its zoning ordinance. *Caln Nether Co., L.P,* 840 A.2d at 491. Wal–Mart's study provided ample information to the Board regarding existing traffic conditions, future traffic conditions and possible steps that could be taken to alleviate any traffic problems resulting from the development of the Wal–Mart site. In response to the findings of the TIS, the Board imposed conditions upon Wal–Mart such as the widening of existing roads, the installation of traffic signals and turn lanes. Thus, the TIS clearly served its intended purpose of assisting in the orderly development of the C–2 commercial district. This Court sees no reason why it should contradict the Board's own interpretation of § 20.7.D.12 and require that Wal–Mart study every road and intersection within a mile of the Wal–Mart site.

**E. Did the Environmental Impact Study (EIS) satisfy the requirements of the Zoning Ordinance?**

Section 20.7.D.10 of the Zoning Ordinance requires that Wal–Mart conduct an EIS. Appellants assert that Wal–Mart failed to evaluate and address background light and glare on site and in surrounding neighborhoods. The Zoning Ordinance does not specify any particular lighting limits or levels. Section 18.11 of the Zoning Ordinance addresses the general standards for illumination and states:

> Parking and loading areas shall be illuminated whenever necessary to protect the public safety. Such illumination shall be so designed and located that the light sources are shielded from the adjoining residences and residential streets, and shall not be of excessive brightness or cause a glare hazardous to pedestrians or drivers.

*See* Zoning Ordinance § 18.11.

The Board found that Wal–Mart had submitted an EIS pursuant to § 20.7.D.10, which evaluated the site and proposed use and compared pre-development and projected post-development conditions including background light and glare conditions. *See* Board Opinion at ¶ 112. The Board also found that, as required by Zoning Ordinance § 20.7.D.7, the

> Plans and the Conditional Use Report and the testimony adduced at the Hearing provide a description of the proposed methods of control of development in sufficient detail to indicate the levels of production of noise, *glare,* air pollution, water pollution, fire hazards, traffic congestion and other safety hazards or environmental effects, to the extent such information is relevant to a conditional use proceeding.

*See* Board Opinion at ¶ 109 (emphasis added). Finally, the Board found that there are certain types of light sources which would produce less glare than those proposed by Wal–Mart. *See* Board Opinion at ¶ 120. As a condition of its approval of Wal–Mart's conditional use application, the Board required that parking lot lighting must be reduced by 50% during the hours that the store is closed. *See* January 23, 2006, Board Opinion at 3. The Board concluded that Wal-Mart had met its burden to prove that the proposed use will comply with the objective standards of the Zoning Ordinance found in Articles 18 and 20. Having reviewed the record, we agree.

▮ Appellants assert that the Board's imposition of Condition No. 21 requiring

reduction of lighting levels during off hours is an impermissible attempt to cure a defect in the conditional use application. The Board did not find that the glare created by Wal–Mart's proposed use would cause "excessive brightness" or a "glare hazardous to pedestrians or drivers" such that Wal–Mart's lighting design would be in violation of § 18.11 of the Zoning Ordinance. Rather, the Board found only that other light sources would produce *less glare* than the sources Wal–Mart proposed to use. Further, Appellants assert that under *Edgmont Township v. Springton Lake Montessori School, Inc.*, 154 Pa. Cmwlth. 76, 622 A.2d 418 (1993), the Board is not permitted to grant a conditional use application premised upon compliance with a condition which would cure a defect in the application. Contrary to Appellants' assertion, the Board did not impose Condition No. 21 to remedy a defect in Wal–Mart's conditional use application, but rather properly imposed the condition in order to minimize any adverse impact caused by the proposed use. *See Edgmont Twp.*, 622 A.2d at 420 (the proper function of a condition imposed upon a special exception is to reduce the adverse impact of that permitted use).

### F. Did Wal–Mart's application comply with the yard requirements of the Zoning Ordinance?

■ Appellants assert that Wal–Mart's site plan does not comply with the front and side yard requirements for Lot 1 because parking spaces intrude upon the front yard. Appellants contend that off street parking areas, access streets and curbs constitute structures that infringe upon required setbacks and that since the definition of "Yard" requires open space "unoccupied by a structure," Wal–Mart failed to meet the yard requirements.

■ Each zoning case must be decided on its own facts, and in special exception and conditional use cases, the standard is whether the plan as submitted complies with all zoning requirements. *K. Hovnanian Pennsylvania Acquisitions, LLC v. Newtown Twp. Bd. of Supervisors*, 954 A.2d 718, 725 (Pa.Cmwlth.2008) [citing *Lafayette College v. Zoning Hearing Board of Easton*, 138 Pa.Cmwlth. 579, 588 A.2d 1323 (1991)]. Section 10.3 of the Zoning Ordinance specifies that the minimum yard requirements for a building in a C–2 General Commercial District are 60 feet at the front, 30 feet on each side and 30 feet at the rear of the building. We find no problem with Wal–Mart's presentation of the proposed parking areas and access roads. Appellants' assertions regarding violations of the set back requirements are premised upon the renderings of the Lots 2, 3, 4, and 5. Although the plan shows renderings for all five proposed lots, Wal–Mart is only seeking conditional use approval for Lot 1. Thus, the Board was required to determine only whether Wal–Mart's plans for Lot 1 complied with the front and side yard requirements with regard to the existing roads and the proposed public street. A review of the proposed plan clearly demonstrates that sufficient acreage exists for Wal–Mart to comply with the set back requirements of the Zoning Ordinance.[12]

### IV. DID APPELLANTS FAIL TO ESTABLISH AN ADVERSE IMPACT?

■ Appellants assert that common pleas erred in affirming the Board's finding that they failed to meet their burden to

---

12. We note that if and when Wal–Mart develops Lots 2, 3, 4 and 5, it will be required satisfy the set back requirements of the Zoning Ordinance for each site it develops based upon the conditions that exist at the time each plan is submitted.

demonstrate a detrimental impact upon the community. By showing compliance with the specific requirements of the zoning ordinance, an applicant seeking a conditional use identifies the proposal as one which the local governing body has expressly designated to be appropriate in the district and, therefore, presumptively consistent with the promotion of health, safety and general welfare. *Tennyson,* 952 A.2d at 746. The burden then shifts to objectors to rebut the presumption by proving that the proposed use will adversely affect the welfare of the community in a way not *normally expected* from the use.[13] *Id.* at 746. In general, protesters must provide evidence that there is more than a *"mere speculation* of harm." *Szewczyk v. Zoning Bd. of Adjustment of the City of Pittsburgh,* 654 A.2d 218, 224 (Pa.Cmwlth.1995) [quoting *Abbey v. Zoning Hearing Bd. of the Borough of East Stroudsburg,* 126 Pa. Cmwlth. 235, 559 A.2d 107, 110 (1989) (emphasis in original)].

■■■■ Appellants presented the testimony of both experts and laypersons regarding their belief that the proposed use would have a detrimental effect on the surrounding community. The Board found that the evidence regarding noise and air pollution was insufficient because it failed to demonstrate these impacts would be greater than the impact customarily associated with the proposed use. The Board also rejected the testimony of other experts offered by Appellants regarding air quality, storm water management, value of real estate, and traffic flow. The Board as the fact-finder has the ability to reject even uncontradicted testimony that it finds not credible or unpersuasive. *Nettleton v. Zoning Bd. of Adjustment of the City of*

*Pittsburgh,* 574 Pa. 45, 828 A.2d 1033 (2003).

■■■■ Appellants assert that the proposed use will drastically increase the traffic in the neighborhood and alter the current rural/residential character of the neighborhood. An increase in traffic or exacerbation of an existing traffic burden is not sufficient to defeat a conditional use. *Kern v. Zoning Hearing Board of Tredyffrin Twp.,* 68 Pa.Cmwlth. 396, 449 A.2d 781 (1982). Rather, Appellants were required to show that the proposed use would "generate traffic patterns not normally generated by that type of use and that such 'abnormal' traffic will pose a substantial threat to the health and safety of the community." *In re Brickstone Realty Corp.,* 789 A.2d 333, 341–42 (Pa.Cmwlth. 2001). Appellants' traffic expert, Mr. Nawn, failed to present objective evidence such as traffic counts or studies, to show that the increased traffic was abnormal for the proposed use. Further, although the area currently has a rural/residential character and the introduction of commercial uses will alter that character, such a change in character or alleged incompatibility of uses is not sufficient to defeat a conditional use. *Appeal of Mignatti Construction Co., Inc.,* 3 Pa.Cmwlth. 242, 281 A.2d 355 (1971) (holding that a change in character of a residential area does not justify the denial of a conditional use).

The Board concluded that Appellants "failed to meet their burden to prove by substantial, credible evidence ... that the proposed Store would impact the community to an extent greater than a similar type of use proposed for the Property." Board Opinion at ¶ 21. Having reviewed

---

13. Appellants seem to be under the misapprehension that they were merely required to show that the proposed use would have a detrimental impact on the neighborhood. However, Appellants were required to demonstrate that the proposed use will have a *greater detrimental impact* than would be normally expected from such a use.

the record we conclude that the Board did not err.

For the foregoing reasons, we affirm.

### ORDER

AND NOW, this 13th day of August, 2009, the order of the Court of Common Pleas of Lebanon County in the above captioned matter is hereby AFFIRMED.